IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,451






RAMON HERNANDEZ, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL IN CAUSE NUMBER 2002-CR-1613


FROM THE 175TH DISTRICT COURT 


OF BEXAR COUNTY





 Keasler, J., delivered the opinion of the Court in which Keller, P.J., and Meyers,
Price, Womack, Johnson, Holcomb, and Cochran, JJ., joined. Hervey, J., did not
participate. 





 On October 9, 2002, Ramon Hernandez was convicted of the offense of capital
murder. (1) Pursuant to the jury's answers to the special issues set forth in Texas Code of
Criminal Procedure Article 37.071, Sections 2(b) and 2(e), (2) the trial judge sentenced
Hernandez to death. (3) Direct appeal to this Court is automatic. (4) Hernandez raises five points
of error challenging his conviction. We reject his contentions and affirm the trial court's
judgment.

 In his first point of error, Hernandez contends the evidence is legally and factually
insufficient to support the jury's verdict. Specifically, he challenges the sufficiency of the
evidence to show that he had the culpable mental state to commit capital murder. In
reviewing the legal sufficiency of the evidence, this Court looks at all of the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt. (5) 

 Hernandez was indicted for the capital murder of Rosa Rosado. The indictment
alleged that Hernandez intentionally and knowingly caused Rosado's death during the course
of committing or attempting to commit aggravated sexual assault, kidnapping, or robbery. 
The indictment also included a paragraph which alleged that Hernandez intentionally and
knowingly caused Rosado's death during a different criminal transaction, but pursuant to the
same scheme and course of conduct in which he knowingly and intentionally caused the
deaths of Priscilla Almares and Sarah Gonzales namely, asphyxiation. If the evidence is
sufficient to support one of the theories alleged in the indictment, we need not address the
remaining theories. (6) 

 A person is guilty of capital murder if he intentionally or knowingly causes the death
of an individual while committing the offense of kidnapping. (7) A person is guilty of the
offense of kidnapping if he knowingly and intentionally abducts another person. (8) The law
of parties, with which the jury was charged, provides as follows: 

If in the attempt to carry out a conspiracy to commit one felony, another felony
is committed by one of the conspirators, all conspirators are guilty of the
felony actually committed, though having no intent to commit it, if the offense
was committed in furtherance of the unlawful purpose and was one that should
have been anticipated as a result of the carrying out of the conspiracy. (9)


 Patricia Hernandez testified that on March 31, 2001, she was at the movies when she
phoned her mother, Rosa Rosado, at home to wake her up to go to work. Rosado worked
nights and took the bus to work. When Rosado did not return home the next morning,
Patricia contacted the police and the Heidi Search Center. 

 Detective John Kellogg testified that on April 5, 2001, he and Detective Andrew
Carian and another detective met with Asel Abydgapparova, who related that she was
Hernandez's girlfriend and that she was pregnant with his child. She stated that she had
information about a murder and the location of a body. Based on the information
Abdygapparova gave the police, Hernandez was arrested and taken to the Bexar County Jail. 
While in jail, Hernandez asked to speak with the detectives assigned to this case. Detectives
Kellogg and Carian met with Hernandez. He gave a statement, which was admitted at trial,
in which he admitted his participation in the present offense.

 Specifically, Hernandez related in his statement that he, Abdygapparova, and Santos
Minjarez were driving around town on the night of March 31, 2001, when they agreed to find
a victim to rob. They spotted Rosado at a bus stop and saw her walk across the street to a
pay phone located outside of a convenience store. They parked and watched Rosado talk on
the pay phone for "about five, ten, or maybe fifteen minutes" before she walked back to the
bus stop. Rosado stayed at the bus stop for thirty seconds and then started back across the
street. Minjarez told Hernandez to pull the car up next to her quickly. Hernandez complied,
and Minjarez grabbed Rosado's purse. Minjarez then pulled the woman into the car and told
Hernandez to "go, go, there is a car coming." Hernandez "gunned it" and drove off. The
passenger door was still open and, when Hernandez turned a corner, it slammed on Rosado's
leg. He stopped at the next light so that she could pull her leg inside the car. He stopped
again to let her out, but Minjarez instructed him to keep driving, so he did, without letting
her out. Hernandez drove to his home, where Abdygapparova obtained some mailing tape
to cover Rosado's mouth. Minjarez covered Rosado's mouth and placed a towel over her
head. The group then decided to take Rosado to a motel. They attempted to get a room at
one motel, but there was no vacancy. Abdygapparova went into another motel and was able
to get a room. Hernandez, Minjarez, and Abdygapparova took Rosado into the motel room,
and Minjarez and Abdygapparova pushed her down onto the bed. 

 Hernandez claimed that Minjarez and Abdygapparova then began to go through
Rosado's belongings and noticed an ATM card. They demanded to know the pin number,
but Rosado told them she did not have one. While this was going on, Hernandez was "doing
[his] rounds," making sure no one was around the motel room. Hernandez then pulled
Abdygapparova into the restroom and told her not to touch anything because she was leaving
fingerprints in the motel room. Abdygapparova replied that he need not worry because they
could just burn everything. Hernandez heard Minjarez ripping Rosado's clothes off and left
the bathroom. He saw Minjarez put on a condom and begin to rape Rosado. Hernandez went
back into the bathroom. After Minjarez finished raping Rosado, Hernandez left the bathroom
and "did [his] rounds again." Minjarez and Hernandez then discussed getting rid of any
evidence and decided to send Abdygapparova out to get "some douches and some Clorox." 
Minjarez then took Rosado into the restroom and "cleaned her private parts with soap and
water." 

 When Abdygapparova returned, she and Hernandez went into the restroom to discuss
what to do. They heard Rosado crying and looked out to see Minjarez raping her again. 
When Minjarez finished, he joined Abdygapparova and Hernandez in the restroom and told
them that he was ready to go. In his statement, Hernandez specifically said, "I suspected that
he wanted to kill the woman [Rosado]." Minjarez stated that he had just been released from
prison and wasn't about to go back. Minjarez told Hernandez all he needed from him was
a shovel. Hernandez instructed Abdygapparova to go get a shovel. Minjarez and Hernandez 
began to remove any evidence of their crime. Hernandez then went outside to make sure no
one was around. When he returned to the room, he observed Minjarez sitting on top of
Rosado holding a pillow over her head. He left the room and, when he came back ten
minutes later, Rosado was dead. Hernandez and Abdygapparova assisted Minjarez in
dumping Rosado's body and getting rid of her belongings.

 Assuming that the jury believed Hernandez's version of his limited participation in
Rosado's kidnapping and murder, his statement alone is enough to find the evidence legally
sufficient. Hernandez kidnapped Rosado. He not only participated in her abduction, he
drove the car that took her to his home, to the motel that had no vacancy, and to the motel
where she was raped and killed.

 With respect to Rosado's death, Hernandez claims that he did not know Minjarez was
going to kill Rosado and was shocked to find her dead when he returned to the motel room. 
However, in his statement, he relates that he suspected Minjarez was going to kill Rosado,
and before her death, instructed Abdygapparova to go out and get a shovel. He witnessed
Minjarez holding Rosado down on the bed with a pillow over her head and went outside to
make sure that there was no one around. Although, according to his statement, he did not
hold the pillow over Rosado's head, he is still responsible for her death under the law of
parties. The evidence is legally sufficient to support the jury's verdict of guilt.

 In the same point of error, Hernandez claims that the evidence is factually insufficient
to support the jury's verdict. In a factual sufficiency review, the appellate court views all the
evidence without the prism of "in the light most favorable to the prosecution" and will set
the verdict aside only if the evidence is so weak that the verdict is clearly wrong and
manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a
reasonable doubt could not have been met. (10) A verdict is clearly wrong and unjust if the
jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates
bias." (11) The only evidence that Hernandez presented at trial was presented to controvert the
murders of Priscilla Almares and Sarah Gonzales, not the kidnapping and murder of Rosado. 
Therefore, for the same reasons we find the evidence legally sufficient, we also find it
factually sufficient. Hernandez's first point of error is overruled.

 In his second point of error, Hernandez claims that the trial court erred in denying his
motion to quash the indictment. Specifically, he claims that the indictment "failed to give
adequate notice to Appellant and failed to enable Appellant to plead the judgment that may
[be] given upon it in bar of any prosecution for the same offense." He argues that, "where
the manner and means are unknown to the Grand Jury and where four different theories of
capital murder are alleged in the indictment, failure to limit or allege the constituent elements
essentially distorts o[r] vacates any notice to the Appellant of what he is exactly being
charged with." We have previously held adversely to Hernandez's position. (12) Hernandez's
second point of error is overruled.

 In his third point of error, Hernandez argues that the trial court erred in failing to
suppress his oral and written statements, that the trial court erred in allowing the State to
elicit testimony regarding Hernandez's written statement, and that Article 38.22 was violated
when the trial court failed to make findings of fact regarding the voluntariness of his
statement. Hernandez fails to apply the law to the facts in this case with respect to all three
of his allegations. He simply makes bare assertions. We will not address this point of error
because it is multifarious and inadequately briefed. (13) Hernandez's third point of error is
overruled.

 In his fourth point of error, Hernandez alleges that the trial court erred in admitting
numerous photographs numbered as Exhibits 3-31, 61-80, and 207-56. He argues they
should not have been admitted because they were cumulative and more prejudicial than
probative. The record reflects that many of the exhibits Hernandez complains of are not
photographs. Moreover, many of the exhibits he claims were improperly admitted were not
admitted at all. We will consider his claim only with regard to the photographs that were
admitted.

 Hernandez argues that they were unfairly prejudicial because they were cumulative
and they showed the exposed genitalia of the victims. But he does not explain why the
photographs were more prejudicial than probative. Considering that one of the underlying
offenses in this case is aggravated sexual assault, the photographs were certainly probative. 
Without more, Hernandez's claim must fail. His fourth point of error is overruled.

 In his fifth point of error, Hernandez contends that he received ineffective assistance
of counsel because his attorneys failed to ask the trial court's help in locating witnesses. 
When reviewing a claim of ineffective assistance of counsel, this Court utilizes the two-prong test set forth in Strickland v. Washington. (14) Under the first prong of the Strickland test,
Hernandez must show that counsel's performance was deficient. "This requires showing that
counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed
the defendant by the Sixth Amendment." (15) Under the second prong of the Strickland test,
Hernandez must show that counsel's deficient performance prejudiced him. "This requires
showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial
whose result is reliable." (16) In other words, Hernandez "must show that there is a reasonable
probability that, but for counsel's unprofessional errors, the result of the proceeding would
have been different." (17) There is "a strong presumption that counsel's conduct falls within
the wide range of reasonable professional assistance[.]" (18) 

 In most cases, counsel's reasons for his or her actions or inactions do not appear in
the record. In Thompson v. State, we explained that in order to defeat the presumption that
counsel rendered effective assistance of counsel, "any allegation of ineffectiveness must be
firmly founded in the record, and the record must affirmatively demonstrate the alleged
ineffectiveness." (19) However, in this case, counsel's reasons for not asking the trial court's
help in locating the witnesses in question appear in the record.

 During the guilt or innocence phase of trial, Detective Martin Landgraf, the officer
in charge of the murder investigation in this case, testified for the State. On cross-examination, defense counsel attempted to ask Landgraf whether or not he had taken
statements from witnesses who identified other suspects in the case. The prosecutor objected
to hearsay, and the trial court sustained the objection. Defense counsel rephrased his
question, but an objection was again made and sustained. When defense counsel attempted
to ask the question another way, the prosecutor asked that the jury be excused so that the
matter could be discussed outside the presence of the jury. The jury was excused and a
discussion of whether or not defense counsel's question was hearsay ensued. During this
discussion, the issue of whether or not the witnesses in Landgraf's report were availablecame
up. The following exchange occurred:

 THE COURT: What about all the witnesses in his report? Have you
issued subpoenas for those people?

 

 [DEFENSE COUNSEL]: Well, Judge, we've tried to locate Tina Marie Garcia. 
Okay. We had the investigator late last night trying to
locate her. She's a family member. She doesn't work at
the same location. The address we had - - we got the
subpoena issued, but we don't have access. This is - -
Judge, it's nine years, almost nine years ago.


 THE COURT: Well, is Tina the only person who talked about this type
of information?


 [DEFENSE COUNSEL]: Well, no Judge. There's a lot of them, but I'm - -


 THE COURT: And?


 [DEFENSE COUNSEL]: Well, I'm not - - I don't want to - - I'm not going to
inquire into the specifics of the conversation. But at least
I think I have a right to cross examine him regarding the
general nature of the investigation that involved gang
activity.


 [THE PROSECUTOR]: Well, Judge, he doesn't get to open his own door. And,
as I said, he did, in fact, attempt to elicit the hearsay and
then is trying to do it back door, which is the point which
I asked to approach the bench. By saying - - by putting
the cart before the horse, well, you had the information
on gang material. I guess you got this from whoever. 
That's hearsay. As my partner astutely points out, the
purpose of the hearsay rule is to prevent unreliable
evidence from getting before the jury.


 [DEFENSE COUNSEL]: Well, that's [the prosecutor]'s labeling of unreliable,
Judge.


 THE COURT: Apparently Tina is not the only person who may have
discussed the gang issue; is that correct?


 [DEFENSE COUNSEL]: That's correct, Your Honor.


 THE COURT: And those people you've tried to track down?


 [DEFENSE COUNSEL]: That's correct, Your Honor.


 THE COURT: And you haven't been able to track down anybody?


 [DEFENSE COUNSEL]: Well, Judge, we've got a couple of witnesses that were
not related.


 THE COURT: How?


 [DEFENSE COUNSEL]: Who are going to come forward obviously because they
have been subpoenaed. But it's a situation where, I
mean, trying to locate a 14-year-old who is now 23 - -


 THE COURT: Uh-huh.


 [DEFENSE COUNSEL]: You can understand the difficulty that we've had.


 THE COURT: I can -


 [DEFENSE COUNSEL]: I mean, some of these witnesses are deceased. Some of
the other witnesses are deceased because they were
elderly.


 THE COURT: But not all of them are deceased; is that correct?


 [DEFENSE COUNSEL]: Well, that's true, Judge.


 THE COURT: And these persons who may have discussed whether or
not there was gang activity have been - - those people,
their names have been available to you for a long time. 
And please don't tell me that I didn't give you adequate
time to prepare, because I don't think you can say that.


 [DEFENSE COUNSEL]: I'm not saying that, Judge. What I'm saying is the
passage of time has removed a lot of these peoples'
availability to the defense. The fact that we have an
address that is ten years old doesn't do us a lot of good. 
We're trying to follow - - we don't have the same
resources, you know, as the State does.


 THE COURT: But I think that if you had approached the Court and
asked for the resources, I certainly would have provided
them. Did you contact me? Did you tell me that you
were having a hard time locating these people?


 [DEFENSE COUNSEL]: Judge, we were taking every effort that we could with the
resources that the Court made available. I'm not going
to say it's a dollar amount of resources; it's just the
availability of the information that - - you can give me
ten investigators. They don't have the resources or the
availability or resources to allow us to discover these
people.


 THE COURT: Mr. McClure, do you know where these people are
today?


 [THE PROSECUTOR]: No, ma'am.


 THE COURT: Did you try to locate them?


 [THE PROSECUTOR]: Honestly, I don't believe I did, because ultimately it is
also true, Judge, that none of this is relevant to the fact
that it is Ramon Hernandez' sperm in the anal swab. 
And to suggest to the jury that somebody else may have
been involved with him is honestly not relevant to
whether or not Ramon was involved. I mean, it certainly
doesn't go to show that he was not, and - - 


 [DEFENSE COUNSEL]: I believe that's a decision for the Court to determine
what is or what is not relevant regarding the murder of
these two young ladies.


 THE COURT: I agree. And I'm going to rule that it is not relevant, and
I'm sure that if you thought the information was relevant,
then you would have done everything in your power to
get those people here.


 [DEFENSE COUNSEL]: Well, I would like to, just for the record, just so that we
have made every effort available to us to locate these
witnesses.


 THE COURT: But you never came - -


 [DEFENSE COUNSEL]: And for the Court to indicate that we haven't done that is
improper, I believe.


 THE COURT: But the problem is that you never came to the Court to
tell me that you needed more time or that you needed
resources to locate these people. Is that correct?


 [DEFENSE COUNSEL]: Well, it's not a matter of resources or time. If they are
not available, they are not available, Judge. I mean, if
they are no longer living at the same address and we run
social security numbers, date of birth, and some of that
we don't have even from their report.


 THE COURT: But if you had asked for that information, we would have
done everything possible to get you that information,
even if this officer here would have been enlisted to help
you locate those people. There was adequate time to
prepare. It is not relevant. It was part of the
investigation, but nonetheless, none of those so called
leads led anywhere. And, therefore, it is not relevant at
this time, and so call the jury back in.


 [THE PROSECUTOR]: I would like to add, Judge, that it appears to me that Mr.
Ugarte is correct in saying they have done everything
they could. And the fact of the matter is, they have been
duly diligent, I would suggest, but the absence or
unavailability of a witness doesn't change the fact that
hearsay doesn't come in for the purpose of trying to elicit
it.


 THE COURT: That is accurate. And I agree with that. And I know that
Mr. Ugarte and Mr. Hancock have worked very, very
hard on this case. I understand that. But again, this was
part of the investigation, the leads led nowhere. It is not
relevant. It is hearsay. And therefore, we will not go
into these matters. Anything else?


 Defense counsel stated on the record that he did everything he could to locate the
witnesses in question. Although the trial judge scolded defense counsel several times for not
asking the trial court for additional resources in locating these witnesses, it is apparent from
the record that both defense counsel and the prosecutor were confident that no amount of
additional resources would have located these witnesses. This being the case, Hernandez is
unable to show his attorney's performance was deficient. Moreover, because the trial judge
ruled the witnesses' testimony was not relevant, and therefore, inadmissible, appellant cannot
show he was prejudiced by counsel's alleged deficient performance because the jury never
would have heard the witnesses' testimony, even if they had been located. 

 Hernandez also argues that counsel was ineffective because he "failed to object to
questionable exhibits offered by the State, failed to object to comments on the weight of the
evidence during closing argument by the State, and failed to urge specific objections or seeks
[sic] a ruling on objections made." He then gives "just one volume of the record" and lists
23 different page numbers from that volume. He does not specify the exhibits or the
comments to which counsel should have objected. He fails to demonstrate that counsel's
performance was deficient. Hernandez's fifth point of error is overruled.

 We affirm the judgment of the trial court.


DATE DELIVERED: March 23, 2005

DO NOT PUBLISH


1. Tex. Penal Code Ann. § 19.03.
2. Unless otherwise indicated, all references to articles refer to the Texas Code of
Criminal Procedure.
3. Art. 37.071 § 2(g).
4. Id. at § 2(h). 
5. Jackson v. Virginia, 443 U.S. 307 (1979). 
6. Kitchens v. State, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991), cert. denied, 504
U.S. 958 (1992). 
7. Tex. Penal Code Ann. § 19.03(a)(2).
8. Id. at § 20.03(a).
9. Id. at § 7.02 (b).
10. Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). 
11. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). 
12. Dinkins v. State, 894 S.W.2d 330, 338-339 (Tex. Crim. App.), cert. denied, 516
U.S. 832 (1995). 
13. Tex. R. App. 38.1; Wood v. State, 18 S.W.3d 642, 649 n.6 (Tex. Crim. App. 2000). 
14. Strickland v. Washington, 466 U.S. 668 (1984). 
15. Id. at 687.
16. Id. 
17. Id. at 694. 
18. Id. at 689.
19. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999), citing McFarland
v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996).